10-21-14 Mary Mary and Stephen C. McLauchlan v. David C. McLauchlan For David. Good morning, Your Honors. My name is Howard London. I represent the Respondent Appellant David McLauchlan. Good morning, Your Honor. I'm Stephen Klein. I represent Patricia McLauchlan. Each time is 15 minutes. It's an interesting case. We'd appreciate it. I'm sure you've read the briefs. We're familiar with the pertinent portions of the record, so we'd behoove you to get to your strongest point first. So any time you're ready. Thank you. You'll have some five minutes for reply. Thank you. Your Honor, I'm here on behalf of David McLauchlan to ask for the relief he did not receive from the trial court, which is at the very least an abatement of his maintenance obligation as a result of his loss of his job, his total loss of any business income, and the necessity that he substantially deplete his retirement funds in order to live. How much does he have left? As of the last hearing date, he had approximately $200,000 left. If he kept paying her out, if he kept paying his spouse from these early withdrawals of his pension plan, how many years would it take for him to bust it out? Well, it wouldn't have taken long because he was almost busted out by the time of the hearing, because at that point he didn't have any other sources of income. In fact, he had just started up a new practice after being kicked out of his former partnership, and he had negative revenues from his practice because he had the rent and other startup costs. So when you added that, and he didn't have those expenses when he was earning money as a partner at Lord. So when you add that to the huge debt that he had, plus obligation, plus the maintenance obligation imposed on him, he was really hopeless. You know, there's a host of cases that allow these withdrawals from a pension plan, which I believe are really a return on capital as opposed to income. But there's a host of child support cases that allow it to be considered income. Exactly. Why are maintenance cases different? Maintenance cases are very different for several reasons. First of all, the parties to a divorce can't bargain away the rights of a child to be supported. And it's not unfair if either party has financial resources to support a child, to be required to support the child from whatever sources. In this case, for example, though, we had a marital settlement agreement, which divided approximately $800,000 in retirement accounts between these two people, and they each agreed, as part of that marital settlement agreement, that they would waive any claims to the other's retirement funds. So given that waiver, it would be contrary to the agreement, contrary to the judgment that incorporated in the agreement, to later on when the husband, who has no lesser right to be supported than the wife, loses his job and then needs to draw on those funds in order to support himself. It's unfair for the wife to then come in and say, well, wait a minute, I want maintenance. And in that instance, she is taking a piece of what she had already given up. If you're talking about a child, that deal between the parties really doesn't mean anything. And it's also important to note that even if the court in a child support case should consider and must consider those withdrawals from a retirement account as income, that doesn't necessarily mean that the court has to apply the specific guidelines. The court can deviate from the guidelines in the appropriate circumstances. Okay. Here we're dealing with an MS statement, a marital settlement agreement. Yes. Would there be a difference if the court had originally divided up the marital property pursuant to its determination as to the facts and needs as opposed to an agreement? Well, I think that the only difference is this. I think a property settlement agreement is non-modifiable. And a property settlement judgment is non-modifiable. The difference here that we have with the MSA is that parties do have a right to make agreements that the court doesn't have the right to impose on them. And in this case, parties do have the right to waive maintenance. And although there is not a waiver of maintenance in this case, there was a waiver with respect to certain assets. And insofar as the waiver of any interest in those assets, we would argue, and I think it's pretty clear that to the extent there was a waiver of those assets, there was a limitation of any right to maintenance because by waiving the right to those assets, past, present, and future, you waive your right to look to those assets as a source of support. And I think the obvious point in this case, which was overlooked by the trial court or at least ignored, is that here at a certain point, Mr. McLaughlin's retirement account assets were drawn down below the amount that his former wife had. So at that point in time, I think at the date of trial, she had $600,000 left. He has $200,000 left. So at that point, she had three times, and I'm estimating the numbers aren't perfect, but let's say three times more retirement funds than he had. But under the court's order, if he withdraws, for every dollar he withdraws, he gives her $0.20. He takes out $100,000. He gives her $20,000, even though that leaves him with $100,000, and she still has the $600,000. That didn't make any sense at all. At the very least, the court should have considered their respective financial abilities equal. When his became less than hers, it was inconceivable that he should have to pay maintenance where neither of them had any employment income. His debts were far greater than hers. He had less assets. And the only thing that I can think of that the court expressed as a reason for the decision were inconsistent findings where even though the court found that Mr. McLaughlin didn't voluntarily retire, he was basically shoved out of his law practice, even though the evidence was uncontradicted that he wasn't earning a single net profit penny from the practice of law after he was booted out of his law practice. Were quadros entered in this case? Yes, quadros were entered, and everything was divided pursuant to the quadros. Okay. Counsel, can I ask you about the issue of terminating the maintenance versus modifying it? Yes. The court, it seems to me, and please tell me if I'm wrong, based its ruling on the standard of living of your client wasn't changed. He seemed to have the same standard of living that he had throughout the marriage. And his ability to earn was greater than the spouse. Is that correct? Well, that's what she found, and I'll address both points. First of all, he was in a very narrow window of transition period. So he loses his job. He's finished with it at the end of 2008. The case went to trial at the beginning of 2010. So when the court says he hasn't changed his lifestyle, he's in the middle of trying to deal with trying to practice, trying to earn new income, trying to deal with the fact that he has a house that at that point is underwater. So a big portion of his monthly expenses, or his so-called lifestyle, is the house that he can't do anything with because the mortgages are greater than the house value. Well, other than the house, didn't the court point to clubs or organizations that he was a member of? Right. He was still a member of a country club and there was a private club downtown that he belonged to. But there wasn't any evidence that he was spending any extraordinary amounts of money on those things. And besides the point, regardless of how he was spending his money, it's clear that he did not have the ability to make those expenditures other than by borrowing funds and depleting his retirement account. His wife, at some point in time after he had run down his retirement funds, had a greater ability to live however she wanted. Each party has the right under the law to the same lifestyle, the same standard of living. And when you have maintenance in a case, the purpose of maintenance is essentially to allocate available income between the parties so that they can maintain a lifestyle. To the extent that the income is not available, then each party has to share in the deficit. In this case, she wasn't made to share in the deficit because she was not, he was required to give her part of his retirement funds, but she was not required to give him part of her retirement funds. Counsel, let me ask you this question. Yes. For the sake of argument, let's assume that we feel that the modification was more appropriate than the termination. I'm just assuming that for the sake of argument. Sure. The percentage, the 20 percent, what do you think the reasonableness of that is? Well, let me just answer your question in two ways. First of all, termination of maintenance. Assuming that your honors find that termination of maintenance was inappropriate, was not called for. But there's a halfway between termination and modification, and that's abatement. So the court could have said, and I think it would have been the very least that would have been appropriate in this case, for now, as long as you don't have any earned income, you don't have to pay maintenance. If you earn income, pay her 20 percent. That's fine. Pay her 20 percent or pay her 20 percent over a certain amount of your income so you at least have a certain basic amount to start paying your debts and pay your expenses. All right, because he was ordered to pay 20 percent of everything. And 10 percent of the arrearage. He was ordered to pay 10 percent on the arrearage. He was ordered to pay their statutory interest on about $140,000. So this was a, from David McLaughlin's perspective, this was a hardship that it was the opposite of a gift that kept on giving. So not only was the arrearage, the arrearage was based almost entirely on withdrawals from his retirement account. He needed to take the money from his retirement account to pay bills. So the more he took to pay bills, the less he had in his retirement account for savings for a future, and the less he had and the more he had to pay his ex-wife, then you had, with the arrearage, you have the 10 percent penalty of interest running per year on $140,000. You have 10 percent of what he's earning in addition to pay on the arrearage. You have 20 percent of what he's earning. So he's in a position where, and interestingly, ironically, under the court's order, if he decided I'm not taking any money on my retirement account and I'm not earning income, he doesn't have to pay her a penny. So it's not as if the court was saying you have to pay her $10,000 a year or $20,000 a year. He could have played the game of chicken with her and said I'm not taking out a penny. I'm just going to sit here and I'm not going to pay my mortgage and I'm not going to pay anything. Let all the creditors come at me, and he wouldn't have had to give her a nickel. So when you consider the absurdity that if he does try to act responsibly and take money out of his retirement account to avoid his home going into foreclosure to pay certain bills, all he does is punish himself by doubly depleting himself. He takes out the money from retirement. There's a 20 percent penalty that he has to give to his ex-wife, and he has to pay on the arrearage. So he's losing 30 percent of it. You make the point, counsel, at page 26 of your brief, that after the divorce, your client had made deposits into his retirement account of $435,000. Yes. And then in your request for relief, again, conceding nothing. You're strongly arguing that we should just say that the maintenance award should have been terminated. Is there an alternative besides abatement, which was not really mentioned? You suggest that we could consider, as a last final thing for your client, is to only allow the 20 percent as to the money's post-decree. So the $435,000 is 20 percent, but how could we support the trial court's order of 20 percent of the money where absolutely the MSA says, no, she has no right to that money. So the money that he had put into his retirement account up to the time of the MSA and the divorce going through, that was discussed in the MSA and divided, however it was divided, and nobody contested it at that time. However, the current order in front of this court has ordered that the money taken out that was in David's account at the time of the divorce, when he withdrew that to pay bills or whatever he did with it, the court ordered he has to pay 20 percent of that to Patricia. And if he takes out, as he continues to take out the money he put into the account after the divorce, that's also to be paid out at 20 percent. Is that part of your argument, the last case, the last-ditch stand there? Well, part of the argument is that certainly it's uncontrovertible that the initial retirement award to him is untouchable, and the court's order touches it. I think that it's arguable that the rest of it was untouchable because she waived any rights in any future retirement assets, et cetera. Well, you don't see that in the MSA, frankly. No, you don't see that in the MSA. So here's what I would argue on that. And I pointed that out. Right. No, both sides are being very upfront in this case. And I should also point out that. A rarity in a divorce case. Right. Not rare for me. But we did ask for abatement in our prayer for relief in the brief as well as in the trial courts. I should point that out. That isn't an afterthought at oral argument. Oh, you're right. I'm sorry. I misread. No, it's okay. Since we're being recorded, I just want to clarify for the record. I was the one that was off. So to be totally honest with you on that point, at the very least, the court should have made sure that its order did not claw back money that was totally off the table. With respect to the other amounts, I have two arguments. During the period of time that David was setting aside retirement funds after the divorce, he was paying his ex-wife $168,000 a year in maintenance. So he paid income taxes. He paid $168,000 a year to her. He paid bills. And he put aside a few thousand, 40, 50, whatever it was, thousand dollars a year for retirement. That was for his future retirement. He paid her the $168,000. He more than paid her his fair share of his income on an annual basis. So the end of 2008 comes along. He's out of a job. At that point, at least half of the money in the retirement account is off the table from the MSA. The other half should be off the table because he'd already paid his ex-wife on an annual basis, let's say three or four times those retirement set-asides. Even if that isn't persuasive to you, the fact is that at the point in time when his retirement account funds became approximately the same amount as hers by virtue of having depleted it, they had an equal financial ability because he had no other sources of income. Because they had equal financial ability, there's no basis in the law or logic for him to be paying her anything. Just because he was the one taking money out of his retirement account as opposed to her. Of course, the courts have always historically looked at the ability to pay. Indeed, you would normally think that a lawyer who has been a partner at a prestigious law firm for years would be able to bring in more income than somebody who can work at Kmart. And understanding it's a tough world out there for lawyers. You can still hopefully make more than minimum wage. And here's my answer to that. And here's my answer to that. Fine, fine. If he earns it, give her the 20 percent of it. I'm not saying that he shouldn't have to. If you don't abate it, give him 20 percent of his earnings. If he earns $300,000, give her 20 percent of that. That's what was contemplated by the judge. However, however, he, with respect to their retirement accounts, she had the same ability to earn and the same ability to draw that he did. And at the time of trial, her ability to earn and her ability to draw was three times his. At that point, to say you give her 20 percent of what you're taking from your retirement account when she has a three times ability to take from retirement accounts, that's unconscionable. That's not reasonable. That's an abuse of discretion. He did have potential. And to the extent that he capitalized on that potential, and believe me, he wanted to capitalize on that potential more than she did. I mean, he's the guy who's been a lawyer all his life, and it's pretty obvious from the record that he was not happy with his circumstance. I mean, that's who he was. He was a successful lawyer and was taken away from him. So nobody wanted more to earn money than he did, and certainly there's no indication that he would give up the 80 percent that he would keep as opposed to the 20 percent he would have to give her. Counsel, one more quick question. Sorry. Let's look at the numbers for a minute. In the year of 2008, the court claimed that he owed $32,000 in arrearage. Is that right? Yes. Okay. So that $32,000 was not based on retirement income? No. For 2008, it was based on, I believe that, you know, I'm not sure about that. I believe that. Well, let's just move on. But for 2009, all that was from retirement. A hundred percent. Okay. And 10, same way, the first three months of 10? Right. Yes, a hundred percent. So, again, for the sake of argument, if we consider that we exclude 9 and 10 because it was retirement, what percentage of the income in 2008 do you think would be appropriate? 20 percent is fine. Okay. Answer my question. Thank you. Sure. Why don't you save a few minutes to reply? We gave you a lot of time and we'll hear from Patricia's lawyer. Thank you. Appreciate your questions. No, no. Appreciate it. Mr. Klein. Good morning. Good morning. Proceed. Thank you. I'm sorry. This case comes before you as was a 32-year marriage of a housewife to a prominent attorney in the city of Chicago at a major law firm. The settlement agreement was negotiated and resolved on the eve of trial between each side's counsel. Each side had an attorney, as well as Mr. McLaughlin having also been an attorney. The document itself that both people signed and the document itself, which defines very specifically on A9 and A10 of the appendix, specifically talks about the provisions that each party agreed would govern should either of them come in the future to try and modify maintenance. In particular of note in it is the selection of words used on the page. This wasn't a typical divorce decree where someone said upon a change in circumstances someone can come in and modify under 510. Rather, the parties and counsel, I agree, can actually craft language to determine how they will agree the modification to occur. For a variety of reasons, these people chose to do so and that's what brings us here today. It's interesting to note in the wife's section on page A9, there's a specific reference to different types of income that she receives. There's employment income from which she can earn up to a certain level. There's investment income. In other words, the income on the assets that she was receiving was specifically excluded from the calculation. Contrary, in the agreement that was reached, the contract they both signed and initialed, there's an asterisk that's referenced in two separate sections that specifically governs what right and what provision there's made for Mr. McLaughlin to come back in and seek a modification of support. And it uses the word only in there and it uses the word gross income in there. It doesn't use the word employment income. Nowhere does it reference that, despite using it in the provision that deals with past rights. It doesn't say excluding pension income or excluding retirement income, which is investment income. It doesn't exclude return on investments. In fact, it doesn't exclude anything. There was no presentation at trial anywhere to suggest that gross income has a definition that would exclude retirement income. The case law that's out there that deals with the child support is, I believe, helpful to our situation and that the court has looked at it. But I'm not even certain that it's relevant to this case and that we're really just trying to enforce, and the judge was just trying to enforce, and if you look at her decision, the contract that the two of them made between themselves. And the court specifically made statements in her ruling that the parties are allowed to make the deal that they wish to make, and it's not the court's position to come in after the fact and say, you know what, maybe you made a good or bad deal. Somehow I'm going to help you. This is the contract made. Now, a lot was made by my esteemed counsel, Mr. London, about, you know, look, this is where they found themselves at the time of the hearing. But what he doesn't point out that is important, I think, is that the judgment itself and at the prove-up, the court considered that Mr. McLaughlin's income at the time from employment was $400,000. So when he was paying her $168,000, it was presumed that he would have the balance left. And the $168,000 is deductible to him. So the reference to taxes, this is an above-the-line deduction for Mr. McLaughlin. So after paying $168,000, his gross income left exclusively from employment would have been $232,000 and changed. Can I interrupt you for a minute? Yes. I'm sorry. The marital settlement agreement, what are the exact words of that provision relative to what property settlement said as far as what's the income? Did it say it included all the incomes that you suggested it says? I don't have that. On page A9. Does it say retirement accounts acquired during the marriage? It says gross income. But does it define that? Gross income, by definition, is all sources of income. Well, actually, on page A9 on retirement plans specifically, which is typed in, it reads, each party shall execute any and all documents necessary to waive any and all interests or partial interests in and to the retirement plans of the other party. The other party is receiving pursuant to the terms of this agreement, and there's added verbiage saying there's no money to be withdrawn, and this would be from Mr. McLaughlin's account since she didn't have any, until the Quadros met her. I don't know what the Quadros said, because I don't have them. So it does say that they're waived. They've agreed on retirement, and that's the end of it. Well, that means no one's going to back as far as property division. But property division and income determination are separate provisions. And on a consideration of what gross income is, if you look above where it says property, and you look at them where she can on page A10 come back, it specifically references different types of income. It doesn't exclude the income. You keep referring to it as gross income. And if you want to say this apple is really an orange and it's still an apple, we're talking about retirement plans or an IRA or even a savings account. Monies that the party invests in and deposits are their monies, and they're in the fund for however long. And when they retrieve them from the fund, it's not income. It's a return on capital. Now, for purposes of child support, this Court and other appellate courts have kind of confused what income is and what a return of capital is. You'd like to call it income, but in fact it's a return on capital. And we're dealing in a maintenance case, not a child support case. I don't know that the distinction between a maintenance case and a child support is either relevant here either. Well, it is relevant. I mean, there's overriding public policy concerns to see that parents support their children. And if they're receiving money from a retirement plan and that can aid the support of the child, the Court has determined that we're going to go that route. But here we have two parties, substantial assets that were divided at the time of the divorce. The public policy considerations are not present in that situation. I think there is a public policy to support housewives by spouses. I don't think that it is nonexistent. I think there's a public policy and that's why we have maintenance provisions. And I think that division of property and division of and consideration of income in the future seven years later is very different. I don't think that return on capital is all that retirement plans are. If we look at the facts of the case and the circumstances also, we are looking at a situation in which subsequent to the divorce decree, in addition to having a greater percentage of his $400,000 left after payment of support to his wife, Mr. McLaughlin probably out-earned the $400,000 by a million dollars during the span of time figures. Their own pleadings themselves show Mr. McLaughlin in 2001 at $611,000. That's $211,000 above the $400,000 that was divided. There was 2002, $570,000. In 2003, $596,000. In 2004, $467,000. In 2005, $550,000. In 2006, $607,000. And then he also, from those funds, contributed new retirement monies, choosing how to invest his money, obviously, as his choice. But this gentleman new money was not IRAs, right? It was not your $20,000. It was investments. Would that be right? I'm sorry. The pension money you're talking about, the $435,000 post-decree, was not in the form of an IRA, was it? It was in the form of a greater pension investment. It was not a defined benefit plan. It was, I believe, in the nature of a SEP, like a 401K plan, where he could max out at like $45,000, $46,000, depending on whatever the IRS amount was. So the money he saved in retirement after the divorce didn't come out of the $400,000. He earned twice to three times to four times that in additional salary from which he then funded. I know a dollar is a fungible item, but if you've got an extra $200,000 over the $400,000 and you fund new retirement plans, there's an extra $200,000, whether you put it into retirement or invest it. And in terms of the hardship argument that's being argued, with another million dollars plus the same assets that she received, plus the additional support that he had after paying her, his financial position for seven, eight years, even after divorce, was extraordinarily greater than hers, given the asset division in this case. And the court made specific note that he did, in fact, spend himself into poverty and then try to come into court and make a suggestion that, look at me, I don't have. He was still living in the same house. He was still making the comparable expenditures to all the various clubs and organizations he chose to belong to and taking the trips and travel that he wanted to take all the way through, even all the way through the date of trial. Counsel, would you say that the ruling of the trial court modifies the settlement agreement that was reached between the parties? Yes. I think that in, well, I think that the ruling of the court considered the gross income of the parties, that she made a correct ruling in terms of making the decision that the parties can make a contract to determine what gross income is and gross income is uniformly reviewed. And if you look on the Rule 13 affidavit that attorneys help their clients fill out for purposes of all hearings, and you look at what gross income is, it lists pension income, it lists all levels of income, trust distributions, employment income, dividends, all of those things, which arguably would be return on capital also, all of those things are listed in the Rule 13 affidavit, which is prepared for post-decree hearings as well as pre-decree. But just the question of whether or not the ruling modifies the settlement agreement. I believe it would. I think 20 percent is less than the 168 to 400. I think the 168 over 400 is maybe 37 to 40 percent. And I think the 20 percent order there reduces it 18 to 19 percent. Well, it could be zero, right? If we were to disagree with you and find that the money, if we were to agree with the epilogue, the retirement funds are whatever you want to call them, but they were given away by her in the MSA, it could be zero, right? Meaning she could be cut off at 20 percent of all income. If we disagree with your theory on gross income, she really could get nothing. Is that right? I'm not suggesting you agree that she'll get nothing or that you want her to get nothing, but 20 percent of nothing is nothing the last time I looked. 20 percent of nothing going forward is nothing. The period of time from which she ruled to date, he still had employment income until December of 2008. He just chose not to pay anything. And he also had income from retirement plans that weren't divided. And how much money did the court find was owed from up to December the last day of 2008? It's in your brief. You have that at 30. So of the $75,000 that your client had to give up, how much did the court find was due before he started taking out large sums of retirement funds? She believed that he should stay current. If I pull out her order, I think in 2009 she didn't make any adjustment. You would have to make the calculation based on his employment income for 2007 and 2008. If the court were to discount, use only employment income from Lord Bissell, then the question would be would you consider withdrawals he made from savings that he made after the divorce that weren't divided in the divorce decree? But again, strictly with what income from Lord Bissell, 2007-2008 was the 20 percent. Did a portion of the $75,000 award, was that based on income? It was actually money from the law firm as opposed to withdrawals from a retirement plan. I'd have to go back and make the calculation. I didn't calculate each component from employment income from previously divided retirement or subsequently accrued. I didn't do a three-part calculation of exactly what that amount would be. Counsel, can I ask you on the 2009 income and the court's consideration, was there a mathematical error that was made there? No, I think she believed that he was above and therefore no deviation was necessary. Well, she said 20 percent of the income of 731, which comes out to be 146, I believe the argument was made, and she allowed 168. I think that she determined in the years that there should be a change because the income was in fact below the 4 that she used the 20 percent formula. I think in the year that was above, because she considered gross income to be retirement income, there was no need to make an adjustment because his income was appropriately calculated for that year. Well, why don't we hear from the other side. Thank you. Mr. London, briefly. Briefly, I just want to jump on a few things. First of all, counsel's most of his argument that he started off with is an argument that is at this point irrelevant. The issue as to what is gross income and what is not gross income for purposes of the agreement related to whether or not my client was entitled to a modification. And as Justice Connors asked, he was granted a modification. The agreement does not in any way control what maintenance should be in the event the MSA is modified after the original number of years that it was provided for in the MSA. Secondly, to answer Justice Quinn's question, and there may have been other questions, for 2008, and to correct counsel, Mr. McLaughlin paid $24,500. He didn't pay nothing. He had approximately $284,000 in employment income. Twenty percent of that was $56,000 and change. The court subtracted the $24,500 that he paid and got the resulting arrears of approximately $32,000. For 2009, 20 percent of $731,000, as Justice Connors questioned, computes to about $140,000 and change. And the court inexplicably awarded $168,000 for that year, even though the court's order was 20 percent, up to a cap of $14,000 a month, which is $168,000. So that doesn't make any sense either. And all of that money in 2009 came from withdrawals of retirement accounts or from a trust? Nope. A borrowed? Yeah, 100 percent were retirement withdrawals. I think at that point he wasn't withdrawing from the trust. That was $695,000 from Schwab and $36,000 from Fidelity computes to $731,000 and change. 100 percent retirement. And I think that just to emphasize a response to Justice Harris's question, there is no public policy in Illinois which prefers a woman over a man or a man over a woman when it comes to maintenance. And each of them should be considered equal in the eyes of the law. And at such point in time when their financial resources are equal or the former wife is better, she has no right to take a percentage of the retirement funds under public policy from the husband than the husband would have from the wife. So I think I've covered my points. If there are no further questions, I would ask that the court reverse the decision of the trial court and at the very least abate maintenance for the reasons that I've stated. This case will be taken under advisement. Thank you for your brief and your arguments. Thank you. Thank you very much, Your Honors.